IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 05-30063-HO |
| | ) | |
| Plaintiff, | ) | ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD JAY SILVA and MICAH | ) | |
| JOE DOWNING, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Defendants Edward Silva and Micah Downing are charged in a nine count second superseding indictment. Defendant Silva is charged in count one with bank robbery on or about June 20, 2005. Defendants Silva and Downing are charged with conspiracy to commit robbery and using a firearm during and in relation to a crime of violence in count two. Defendants Silva and Downing are charged with interference with commerce by threat or violence in count three for their alleged roles in a robbery at the Trophy Club on or about August 18, 2005. Defendants Silva and Downing are charged

with using a firearm during and in relation to a crime of violence in count four with respect to the August 18, 2005 robbery. Defendants Silva and Downing are charged with conspiracy to commit bank robbery and using a firearm during and in relation to a crime of violence in count five.   Defendants Silva and Downing are charged with armed bank robbery on or about September 7, 2005, in count six.   Defendants Silva and Downing are charged with using a firearm during and in relation to a crime of violence in count seven with respect to the September 7, 2005 robbery.   Defendant Silva is charged with felon in possession in count eight. Defendant Downing is charged with felon in possession in count nine.

A.   Motion to Sever Count Eight (#57)

Defendant Silva moves to sever the felon in possession charge against him from the remaining counts.   Silva contends that the evidence of the three prior convictions, which would otherwise be inadmissible, would be extremely prejudicial to his right to a fair trial on the other counts against him.

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

Fed. R. Crim. P. 14.

The defendant has the burden of proving that a joint trial is manifestly prejudicial. United States v. Bronco, 597 F.2d 1300, 1302 (9th Cir. 1979). The prejudice must be of such magnitude that the defendant's right to a fair trial is abridged. United States v. DiCesare, 765 F.2d 890, 898 (9th Cir. 1985).

There is "a high risk of undue prejudice whenever ... joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." United States v. Daniels, 770 F.2d 1111, 1116 (D.C.Cir. 1985). The government is prohibited from introducing evidence of a defendant's prior crimes to show that the defendant has a bad character and is therefore likely to have committed the crime with which he is charged. Fed.R.Evid. 404(b); United States v. McKoy, 771 F.2d 1207, 1213 (9th Cir. 1985). The use of other crimes evidence is not looked on favorably and its use must be narrowly circumscribed and limited. United States v. Hodges, 770 F.2d 1475, 1479 (9th Cir. 1985).

The danger that a jury will infer present guilt from prior convictions cannot be ignored by the court in deciding whether to sever a charge that necessitates the introduction of other crimes evidence. See Daniels, 770 F.2d at 1118.

Courts have used two different approaches to severance where the admission of evidence of prior crimes would be inadmissible on some of the counts. In United States v. Busic, 587 F.2d 577, 585 (3d Cir. 1978), rev'd on other grounds, 446 U.S. 398 (1980), the Third Circuit stated,

> in ruling on a pre-trial motion to sever the district court should determine whether evidence of the prior convictions would be independently admissible on the other counts. If it is determined that the convictions would not be admissible on the other counts-that were these counts to be tried alone the jury would not hear this evidence-then severance should be granted.

Other circuits have not adopted a per se rule, but instead examine the record for undue prejudice on a case-by-case basis. See Daniels, 770 F.2d at 1118. The Ninth Circuit has found a per se rule inappropriate, but recognized that there is "a high risk of undue prejudice whenever joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." U.S. v. Lewis, 787 F.2d 1318, (9th Cir. 1986).  It is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, see United States v. Ragghianti, 527 F.2d 586, 587 (9th Cir. 1975), than it is to compartmentalize

evidence against separate defendants joined for trial. Studies have shown that joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case. See Tanford, Penrod & Collins, Decision Making in Joined Criminal Trials: The Influence of Charge Similarity, Evidence Similarity, and Limiting Instructions, 9 Law and Human Behavior 319, 331-35 (1985); Bordens & Horowitz, Joinder of Criminal Offenses: A Review of the Legal and Psychological Literature, 9 Law and Human Behavior 339, 343, 347-51 1985).

Keys in determining whether joinder is prejudicial is the degree to which the evidence can be compartmentalized and the degree in which the jury can be instructed on the purpose of the various types of evidence. United States v. Vasquez-Velasco, 15 F.3d 833, 846 (9th Cir. 1994).

There is likely to be significant overlap in the evidence for all of the charges and the charges appear to involve a common scheme or plan. Defendant could simply stipulate to the prior convictions (preventing the jury from hearing about them) or the jury could first hear and determine the non-felon in possession charges and then return to determine the felon in possession charge. The court can also give limiting instructions, although that may not be very helpful. The motion is denied without prejudice to be raised at a time closer to trial.

B.   Motion to Sever Count Nine (#62)

Defendant Downing also moves to sever the felon in possession charge against him.   As noted above, The Ninth Circuit cautions against the joinder of felon in possession charges without properly safeguarding the defendant from the prejudicial effect of introducing evidence of prior felonies with other unrelated felony charges.  See United States v. Nguyen, 88 F.3d 812 (9th Cir. 1996). However, the prejudice can be mitigated by a stipulation to the prior felonies so that the jury does not hear about the prior felony convictions.  Cf. Old Chief v. United States, 117 S.Ct. 644, 655-56 (1997) (the risk of unfair prejudice substantially outweighs the probative value of the record of conviction, and it is an abuse of discretion to admit the record when an admission was available). Furthermore, the prejudice can be limited through proper instruction to the jury on how to consider the evidence of defendant's prior felony convictions.  See Nguyen, 88 F.3d at 816-17 (stipulation and limiting instructions together with strong evidence of guilt is sufficient to overcome prejudice to defendant).   While severance or bifurcation is the preferred alternative, Nguyen, 88 f.3d at 818, the court declines to grant the motion at this stage of the proceedings and the motion is denied without prejudice to raising the issue of severance at a time closer to trial.   The court notes that, at a minimum, the

trial will be bifurcated to separate the felon in possession charges as to both defendants from the other charges.

C.    Motion to Suppress and Request for Franks Hearing (#58)

Defendant Silva moves to suppress all evidence seized:

1.    during a warrantless search of 502 Whitman Place, Medford, Oregon, in the early morning of September 8, 2007;

2.    All evidence seized during a search conducted pursuant to a warrant at 502 Whitman Place, Medford, Oregon, because the warrant was not supported by probable cause;

3.    All evidence seized during a search conducted pursuant to a warrant for the search of Mr. Silva's Dodge Stratus, because the warrant was not supported by probable cause.

Defendant Silva also moves the court to conduct an evidentiary hearing, in accordance with Franks v. Delaware, 438 U.S. 154, 155-56 (1978), so as to determine whether intentional and/or negligent misstatements or omissions so infected the September 8, 2005 search warrant application and affidavit as to render all evidence (tangible and intangible) seized pursuant to the execution of the search warrant subject to suppression under the Fourth Amendment.

Page 7

1.    Warrantless Search

On September 7, 2005, at about 1:30 a.m., two masked white males robbed a Washington Mutual Bank in Gold Hill, Oregon. Witnesses described seeing a newer white Dodge Stratus, with smoked windows and an aftermarket muffler and chrome wheels, fleeing the scene at a high rate of speed.   There was some confusion from witnesses as to the model, but witnesses clarified it was a Stratus.

A traffic stop on August 16, 2005, revealed that Silva drove a 1997 Dodge Stratus and that Silva's address is 502 Whitman in Medford, Oregon.

Officers arrived at 502 Whitman still in the early morning of September 7, 2005, and observed the Stratus.  Detective Ford of the Medford police knocked at the front door and received no response. At about 7:15 a.m., Silva called Ford about his "sniffing" around his car and told Ford he was in Portland and that his mother was in possession of the keys to the car and was driving it for the past three days.

At about 8:00 a.m., Medford police stopped Thomas Taylor, a friend of Silva's, and discovered a large quantity of money in his car and a bait bill from the robbery.   Officers also discovered that Taylor's cell phone registered several calls to and from Silva's cell phone.

Early on September 8, 2005, police surveilled the 502 Whitman residence (with the Stratus parked in front) and Silva's mother arrived in her own vehicle at about 3:30 a.m.  When police knocked, intending to arrest Silva, Silva's mother, Fonda Lowe, answered. Lowe informed police that Silva was at her residence in California and she initially refused to consent to a search of the house.

Officers explained to Lowe that they just wanted to confirm that Silva was not present and Lowe consented just to a search for Silva.[1]

The officers searched the one bedroom apartment and did not find Silva, but did find a yellow pad lying on the floor of the living room with what appeared to be tallying numbers and radio frequencies on the top page.  Officers informed Lowe that they would obtain a search warrant for the residence and the Stratus. Lowe told officers that the Stratus was hers, but she loaned it to Silva and told officers she was willing to consent to a search of the car and she signed a consent form.  Lowe also agreed to accompany an officer to the Medford Police Department where she told officers that Silva left in the Dodge Stratus shortly after noon on September 7, 2005, with another person, returning later to giver her money for gas and then leaving again.

---

[1]The officers were also concerned for their safety and the safety of others.  During the search, a gun shot was heard. Officers initially believed that defendant Silva may have been present and fired upon Detective Ford.  However, the detective himself accidentally discharged his weapon.

On September 8, Magistrate Judge John Cooney signed a search warrant for 502 Whitman and the warrant application included reference to the yellow pad.  On September 9, 2005, a supplemental affidavit was submitted and a warrant was obtained for the Stratus.

Defendant Silva contends that Lowe did not have any authority to consent and that the consent was not voluntary.

Under the Fourth and Fourteenth Amendments to the Constitution a search conducted without a warrant issued upon probably cause is per se unreasonable subject to only a few established exceptions. Katz v. United States, 389 U.S. 347, 357 (1967).  One of the established exceptions to both a warrant and probable cause is a search that is conducted pursuant to consent.  Davis v. United States, 328 U.S. 582, 593-94 (1946).  Consent must be voluntarily given, and not the result of duress or coercion, express or implied.  Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent.  Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).

Consent need not be obtained from the defendant, but may be shown by obtaining permission to search from a third party who possesses common authority over the premises.  See United States v. Matlock, 415 U.S. 164, 171 (1974).  The authority which

justifies third-party consent rests upon mutual use of property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in her own right and that others have assumed the risk that one of their number might permit the common area to be searched. See id. at 171, n. 7. A determination of consent to enter must be judged against an objective standard, i.e., would the facts available to the officer at the moment justify a man of reasonable caution to belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid. Illinois v. Rodriquez, 497 U.S. 177, 188 (1990). The government has the burden to prove authority to consent by a preponderance of the evidence.

The existence of apparent authority entails a three-part analysis:

> First, did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

United States v. Reid, 226 F.3d 1020, 1025.

The officers observation of Lowe led them to believe she had just showered at the 502 residence, and she did not disclaim

control over the residence.  Further, it appears that she may have
actual control over the residence as she stated she comes over to
the residence every few weeks to work.  It is objectively
reasonable to conclude Lowe had authority to consent to search of
the residence.  The officers reasonably believed that although it
was not her primary residence, it was a secondary residence shared
with defendant when Lowe came to Medford to work as a care giver or
housekeeper.  Thus, the issue is whether Lowe provided voluntary
consent.

There are five main factors to assess the voluntariness of
consent:

> (1) whether defendant was in custody; (2) whether the
> arresting officers had their guns drawn; (3) whether
> Miranda warnings were given; (4) whether defendant was
> notified that he had a right not to consent; and (5)
> whether the defendant has been told a search warrant
> could be obtained.

United States v. Soriano, 346 F.3d 963, 968-969 (9th Cir. 2003).
No one factor is dispositive in determining consent.  United States
v. Chan-Jimenez, 125 F.3d 1324, 1327 n.3 (9th Cir. 1997).

While defendant did elicit testimony that Lowe was not
specifically informed she could refuse consent, Lowe was aware of
the right to refuse consent as she initially refused to consent and
also limited the scope of the consent she did give.  The court
finds that Lowe provided voluntary consent for the search.

2.    The Warrant

Defendant contends that because the warrant relied on the yellow pad, it is invalid.  However, as noted above, the yellow pad was discovered in plain sight pursuant to a valid consent search for defendant given by his mother.[2]

Moreover, the warrant contained more than enough information to support probable cause even without reference to the yellow pad. It contained the vehicle description that matched the one at the robbery, information that Silva left the residence with another white male before the robbery, that Taylor and Silva called each other numerous times, and that Taylor was arrested less than eight hours after the robbery with money from the robbery, etc.

Probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would lead a man of reasonable caution to believe that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  Texas v. Brown, 460 U.S. 730, 742 (1983). A determination of probable cause depends on the totality of the circumstances.  Illinois v Gates, 462 U.S. 213, 238 (1983).

A magistrate's determination of probable cause to issue a search warrant is accorded great deference and is reversed only if

---

[2]During the consent search, officers also observed a picture of Silva and Taylor on the wall.

that determination is clearly erroneous. United States v. Espinosa, 827 F.2d 604, 610 (9th Cir. 1987). "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Illinois v. Gates, 462 U.S. 213, 236 (1982) (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). "In borderline cases, preference will be accorded to warrants and to the decision of the magistrate issuing it." United States v. Martinez, 588 F.2d 1227, 1234 (9th Cir. 1987).

A magistrate is permitted to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). He need not determine that the evidence sought is in fact on the premises to be searched or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit. United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985). Moreover, "a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987).

The warrant application supports probable cause in this case.

### 3.    Franks

In <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that in order to challenge an affidavit valid on its face, a defendant must show (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause. The Court in <u>Franks</u> placed special emphasis on the strict requirement of proof, finding that "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." <u>Id</u>. at 171.

To show entitlement to a <u>Franks</u> hearing, the defendant must make specific allegations that indicate the portions of the warrant claimed to be false. <u>Id</u>. There must be a contention of deliberate falsehood or reckless disregard for the truth. <u>Id</u>. The allegations must be accompanied by a detailed offer of proof, preferably in the form of affidavits. The offer of proof must challenge the veracity of the affiant, not that of his informant. <u>Id</u>. Finally, the challenged statements in the affidavit must be necessary to a finding of probable cause. <u>United States v. Flores</u>, 679 F.2d 173, 176 (9th Cir.1982).

Defendant did not initially identify false statements or reckless omissions.  However, out of an abundance of caution, the motion for a franks hearing has been granted and on July 12, 2007, a hearing was held.  Defendant asserts that there were reckless omissions in the affidavit concerning eyewitness accounts of the car or cars seen at the robbery.  The court finds that there are no false statements in the affidavit and that any omissions would not have, had they been included, precluded a finding of probable cause.

D.    Motion to Suppress Statements (#60)

Defendant Silva moves to suppress all statements made by him to Medford police on or about September 19 and 21, 2005, on the grounds that they were obtained in violation of the Sixth Amendment to the United States Constitution.  Defendant Silva further moves to suppress all statements made by him while in the custody of law enforcement on or about November 11, 2005, and any evidence obtained as a result of those statements, on the grounds that the statements were involuntary and/or obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and the Fifth Amendment of the United States Constitution.

On September 19, 2005, Silva called Detective J. Ivens, a Medford detective investigating the robbery, and asked him to return the seized Dodge Stratus to his mother, in whose name the

car was registered.  Ivens did not give Mr. Silva Miranda warnings, tell him that he had been indicted, or tell him that he had a right to counsel. Ivens did try to get information from Mr. Silva about the robbery.  Examples of questions designed to elicit information about the robbery in the conversation of September 19 were: "Well, that car was seen in Dorris or down in um, in uh, shit help me out here" and "if you're telling us we're way off base in left field here, that's a perfect opportunity for, let's talk about it. What are we off base on here Eddie? Talk to me."

Silva called again on September 21, 2005, to find out how much time Micah Downing could be facing for his alleged role in the offense.  Although Ivens was less proactive in the questioning in the second conversation, he answered Mr. Silva's questions so as to elicit information from him.  Ivens made comments such as "Well what are you hearing?" and "You know why you got such a good shake in [a prior burglary case] Eddie is because you were truthful and you came [inaudible] . . . ."  Again, Ivens failed to give Mr. Silva any warnings.

On November 10, 2005, police arrested Silva in Sacramento.  On November 11, 2005, detectives attempted to question Silva. Initially, they gave no Miranda warnings.  Eventually, they gave Miranda warnings, but they qualified them with statements about the impracticality of obtaining a lawyer. Finally, they continued speaking with Silva despite his apparent invocation of his right to

counsel.  Mr. Silva made various statements in response to the police during this meeting.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As a procedural safeguard to protect this privilege against self-incrimination, the prosecution may not use any statement obtained by law enforcement officers as a result of "custodial interrogation," unless the defendant received Miranda warnings prior to the interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612-13, 16 L.Ed.2d 694 (1966).

A suspect will be held to be in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not leave freely.  Lowe v. United States, 407 F.2d 1391, 1397 (9th Cir. 1969).  Custody is to be determined under all the facts of the case, and that "for one to be in custody, it is not required that he be in handcuffs or even that he be advised in express terms that he is under arrest." Rosario v. Territory of Guam, 391 F.2d 869 (9th Cir. 1968).  The test to determine whether questioning is "interrogation" within the meaning of Miranda is whether "under all of the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.' " United States v. Mata-Abundiz, 717 F.2d 1277, 1278-79

(9th Cir. 1983) (quoting United States v. Booth, 669 F.2d 1231, 1237
(9th Cir. 1981) (quoting Rhode Island v. Innis, 446 U.S. 291, 301,
100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980))).  The operative
test set forth by Bostick is that a seizure occurs only when
"police conduct would have communicated to a reasonable person that
the person was not free to decline the officers' requests or
otherwise terminate the encounter." Bostick, 501 U.S. at 439, 111
S.Ct. 2382.

To determine whether an individual was in custody, a court
must, after examining all of the circumstances surrounding the
interrogation, decide "whether there [was] a formal arrest or
restraint on freedom of movement of the degree associated with a
formal arrest." Stansbury v. California, 511 U.S. 318, 322, 114
S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotation marks
omitted).  The inquiry focuses on the objective circumstances of
the interrogation, not the subjective views of the officers or the
individual being questioned. Id. at 323, 114 S.Ct. 1526.  That is,
courts must determine whether "the officers established a setting
from which a reasonable person would believe that he or she was not
free to leave." United States v. Beraun-Panez, 812 F.2d 578, 580
(9th Cir.), modified by 830 F.2d 127 (9th Cir. 1987); see also
Hayden, 260 F.3d at 1066. The following factors are among those
likely to be relevant to deciding that question: "(1) the language
used to summon the individual; (2) the extent to which the

defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun-Panez, 812 F.2d at 580). Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the Beraun-Panez/Hayden factors are simply ones that recur frequently.

The two phone calls were initiated by Silva while he was a fugitive and his whereabouts were unknown. This was not custodial interrogation. Nonetheless, the government states that it does not intend to use the statements in its case in chief or even any of the November 11, 2005 statements. Accordingly, the motion is denied as moot.

Silva also argue he was denied the right to counsel because at the time of the phone calls he had been indicted. Because the government does not plan on using the statements the issue is moot. The government will not use the November 11 statements either.


E.  Defendant Browning's Motion to Suppress and for a Franks Hearing (#63)

Defendant moves to suppress evidence seized pursuant to issuance and execution of a search warrant for 24510 Redwood

Highway, Kerby, Oregon during the period of September 14, 2005 to September 24, 2005.

Thomas Taylor admitted to a series of robberies committed by himself and Silva.  Taylor also states that Downing became involved in the robberies.  Taylor stated he believed that Downing was currently living in a trailer on Downing's female cousin's (Janet Downing) property in Josephine County on Highway 199 near Cave Junction, Oregon.  Taylor stated he had visited Downing at the property.  There is some confusion as to whether Taylor also stated that Downing might even be living in the main residence because the cousin was having problems with a black male boyfriend.

Taylor identified Downing from a photograph and made statements implicating Downing in the robbery of the Trophy Club tavern in Medford, Oregon on August 18, 2005, and the Gold Hill bank robbery.

After detectives identified 24510 Redwood Highway Kerby, Oregon as the address of a Janet Lynn Downing and determining that Janet Downing had obtained a restraining order against a black male in May of 2005, Agent Jeffrey Gray filed an application for a warrant to search that property address including "a wooden single story brown dwelling, [and] all outbuildings and vehicles associated with the premises" on September 14, 2005.

On September 15, 2005, the warrant was served on Janet Downing and a subsequent search of a handbag in a chest of drawers in her bedroom in the main house located $11,420.00 in cash.

Defendant Downing asserts the warrant application lacked probable cause because it is critically based on Taylor's statements and because all other information in the possession of the agents/officers at that time indicated that defendant Downing was not living at the Redwood Highway property, but that his address was 1264 Sunset, Medford, Oregon.

Defendants alternatively requests a <u>Franks</u> hearing asserting the warrant omits material information because

> Although the affidavit states that Downing checked into the Comfort Inn, Medford on September 7, 2005 at 2:26 p.m. listing his address as 1264 Sunset, Medford and not the Redwood Highway address, it fails to include other information the police had, including current driver's licenses information that also evidenced that Downing was not living near Cave Junction, but was living on Sunset in Medford. Further the affidavit includes information, alleged to corroborate Taylor's stated belief that Downing was living in the main residence at his cousin's Redwood Highway property because his cousin was having problems with a black male, that Janet Downing had a protection order, issued on May 25, 2005 prohibiting, Terrance Lankford, a black male, from having contact with her. What the affidavit fails to report is that the protective order was withdrawn on the same day it was issued, May 25th, so it was not active, had not been in force since May 25th (actually it appears it was issued and withdrawn on May 24th) and that no other protective order had been issued since then (a period of nearly 4 months).

Memo (#64) at pp. 6-7.

The government contends that Defendant Downing does not have standing to assert a Fourth Amendment violation in the search of Janet Downing's residence.  Defendant must show not only that he was legitimately at the premises as an invitee, but that he has a legitimate expectation of privacy there.  The evidence at the hearing demonstrated that defendant Downing had some belongings in the main residence, that he would come into the main residence at times, and would do his laundry there even in the absence of Janet Downing.  Defendant Downing has standing with respect to the main residence.  See United States v. Grandstaff, 813 F.2d 1353 (9th Cir. 1987).  This is especially true since the government argued that Lowe similarly had the authority to consent to a search of the Silva residence.

The government also contends that Taylor's admission against penal interest is reliable and that much information was corroborated.

The warrant application itself provides probable cause.

The evidence at the hearing showed that the protective order was not withdrawn.  Any failure to investigate the address further amounts to no more than negligence.  Moreover, including the allegedly recklessly omitted material would not negate probable cause because the magistrate was informed that defendant's current address was the Sunset address based on the hotel record.

The critical issue here is whether Taylor actually stated that defendant Downing may have stayed in the main residence or if he only stayed in the trailer.  Agent Gray stated that while the video taped portion of Taylor's statement does not indicate Taylor stated that defendant Downing stayed in the main residence, Taylor did state off camera, while taking a smoking break, that defendant Downing could be staying at the main residence.  Gray noted that Downing expressed, off camera, uncertainty as to where exactly Downing stayed on the property, but that he was somewhere on the Downing property.  The court finds the testimony credible and finds that there was probable cause to conclude that defendant, or evidence of the crime could be found at the main residence based on Taylor's statements.

<u>CONCLUSION</u>

For the reasons stated above, the motions to sever counts eight and nine (#57 and #62) are denied without prejudice at this time, but the court  will, at a minimum, bifurcate the trial of the counts.  In addition, the motions to suppress (#58, #60, and #63) are denied.

DATED this __27th__ day of September, 2007.

___ s/ Michael R. Hogan ___
United States District Judge